Filed 10/22/25  In re B.J. CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re B.J. et al., Persons Coming Under the Juvenile Court Law. | |
| | A172270 |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT, | (Sonoma County Super. Ct. No. DEP655702, DEP655802) |
| Plaintiff and Respondent, | ORDER DENYING REHEARING AND MODIFYING OPINION; |
| v. | |
| C.J., | NO CHANGE IN JUDGMENT |
| Defendant and Appellant. | |

BY THE COURT:

It is ordered that the opinion filed herein on September 24, 2025, be modified as follows:

On page 2, in the first paragraph of the background section, the identification of the respondent as "the Sonoma County Department of Social Services (department)" shall be deleted and replaced with "the Sonoma County Human Services Department (department)".

On pages 2 and 3, the initials E.J. shall be deleted and replaced with the initials E.B.

On page 2, the second sentence of footnote 2 shall be modified to read "The department was unable to locate B.J.'s father."

The petition for rehearing is denied. There is no change in the judgment.


Date: _____          ____Brown_____, P. J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re B.J. et al., Persons Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>C.J.,<br><br>    Defendant and Appellant. | A172270<br><br>(Sonoma County Super. Ct. No. DEP655702, DEP655802) |

C.J. (mother) appeals an order terminating her parental rights to her now six-year-old son B.J. and four-year-old daughter J.G. pursuant to Welfare and Institutions Code section 366.26.[1] She contends that the juvenile court erred by (1) denying a request by the children's maternal grandmother (grandmother) for consideration as relative placement for the children under an alternative permanent plan; (2) denying her section 388 petition,

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

which sought to vacate the section 366.26 hearing and grant her custody of her children; and (3) terminating her parental rights after declining to apply the parental-benefit exception. We find no error and affirm the order.

## BACKGROUND

In February 2022, the Sonoma County Department of Social Services (department) filed dependency petitions under section 300, subdivision (b) to protect then three-year-old B.J., nine-month-old J.G., and their 15-year-old sibling, E.J. The petitions alleged that the children were at risk of serious physical harm due to substance abuse by J.G.'s father (father) and a pattern of violent outbursts by father against mother, who failed to protect herself and the children from harm.[2]

At the time the petitions were filed, mother was living with the children in grandmother's home. At the detention hearing, the court ordered that the children remain in mother's care.

In advance of the jurisdiction hearing, the department recommended that the petitions be sustained, the children remain in mother's care with family maintenance services, and a six-month review hearing be scheduled. At the hearing, the court sustained the allegations of the petitions and adopted the department's recommendations.

In September 2022, the department filed a supplemental petition alleging that the previous disposition was not effective in

---

[2] J.G.'s father did not participate in the proceedings and has not filed an appeal of the order terminating his parental rights. The department was unable to locate the fathers of the other two children.

2

the protection of the children.  The petition alleged that, while caring for the children, mother relapsed on methamphetamine and amphetamines as evidenced by a positive drug screening on July 31, 2022.  Additionally, the petition alleged that on June 25, 2022, mother informed the department that she was threatened by father with the children present and on July 31, 2022, mother was assaulted by father.

The report prepared for the detention hearing on the supplemental petition recommended the children be removed from mother's care.  The department expressed concern that, if the parents continued to use substances and not to comply with their case plan, the children would be at great risk of emotional and physical harm.  The report also indicated that grandmother was willing to be considered for placement for B.J. and E.J. but that it would require mother to find another residence.

At the hearing, the children were detained.  E.J. was placed with his maternal grandmother.[3]  The two younger siblings were placed together in a nonrelative foster home.  The six-month review hearing was vacated and a jurisdiction/disposition hearing was set for October 2022.

In advance of the jurisdiction/disposition hearing, the department recommended that the children continue in their foster care placements and that mother be afforded reunification services.  The department acknowledged grandmother's request that B.J. be placed in her care but noted that "there are some

---

[3] Mother's parental rights were not terminated as to E.J. and he is not a party to the present appeal.

3

things that need to be changed to the safety of the home for it to be suitable for a child his age." According to the older sibling, grandmother could not take care of both B.J. and J.G. because they would be "too much" for her and she would have to take them both to work with her.

The court sustained the allegations of the supplemental petition, removed the children from mother's care, and ordered family reunification services to mother. The court also scheduled a six-month review hearing.

In the six-month review report, filed in March 2023, the department recommended continuing reunification services to mother. The department acknowledged that mother had moved out of grandmother's home so that the older sibling could be placed with grandmother and that grandmother still wanted B.J. placed with her, but stated that he could not be placed with her because of the current condition and configuration of her home.

In supplemental reports filed in April and July 2023, the department changed its recommendation and requested termination of reunification services for B.J. and J.G. due to their young ages and mother's lack of progress in completing her case plan. At the hearing, however, the parties stipulated to an additional six months of reunification services for mother, and a twelve-month review hearing was set for September 2023.

In the twelve-month review report, the department recommended terminating reunification services. Again, the report indicates that grandmother expressed her interest in having B.J. placed in her home. The department reported that it

4

had referred grandmother to an agency in the fall of 2022 to address the concerns about the configuration of her home, but that grandmother "has not been able to adequately change the conditions of the home."

At the review hearing, the parties again stipulated to an additional six months of reunification services for mother. The eighteen-month review hearing was scheduled for March 2024.

In the eighteen-month review report filed in April 2024, the department recommended terminating reunification services to mother and setting a section 366.26 hearing. The report explained that mother continued not to comply with drug testing and there were numerous occasions where she would test the following day or miss tests altogether. She struggled with time management and missed visits with the children, therapy appointments, and her mom's group. Mother attended individual therapy with one provider until September 2023, and in December 2023 was referred for additional counseling with a different provider, but that provider ended therapy after mother missed and cancelled sessions, noting mother felt she did not need therapy. The provider reported to the department that she suspected mother was using substances. Mother was encouraged to go to a support group for mothers, but the facilitator noted she was no longer attending and had not attended in over month. Mother did not want to take any medications and did not feel like she needed any. She reported that her stress and mental health issues were directly related to her not being able to be with her children full time. She asserted that she was being abused by the

department, and that if her children were returned and the department was not involved, she would have no mental health issues. Mother was referred to an outpatient drug treatment program but was unable to complete the assessment due to aggressive outbursts during the appointment. She asserts that she does not have substance problem and does not need treatment. The report also notes that while her urinalysis tests have consistently come back negative, testing staff has alerted the department that they believe she is using a shampoo bottle to squeeze urine out of for her tests. The department opined that "[t]his is in combination with her previous hair follicle tests having come back with positive or very concerning results." Finally, the department provided evidence that mother was living with a man who had recently had reunification services for his own children terminated due to his substance use.

The department acknowledged that grandmother was now requesting placement of both of the younger siblings, but expressed concern because the children's "behaviors have been problematic after visits with the grandmother."

At the hearing in June 2024, mother withdrew her contest and her attorney indicated he would be filing a section 388 petition at a later date asking for return. The court terminated reunification services and scheduled a section 366.26 hearing for October 2024.

In September 2024, at the department's request, the court suspended mother's visitation after she refused to adhere to visitation guidelines set forth by the department after an incident

where mother followed the visitation monitor and children after they left the visit.

On October 2, 2024, mother filed a section 388 petition, asking the court to return the children to her care and order family maintenance services. Her petition asserted that she has "made substantial progress towards completing her caseplan and has thus removed the concerns leading to dependency jurisdiction." She indicated that the requested order was in the children's best interests because the children "love their mother very much, enjoy spending as much time with her as possible and providing a safe stable mother to them while reunifying children with parents is always in the best interests of the minors." Mother attached to the petition a 300-page document detailing her compliance with her case plan since the initiation of these proceedings.

Around the same time, the department submitted its section 366.26 report, in which it recommended terminating parental rights with adoption as the permanent plan. The report stated that the children had lived with the same caregivers since September 2022 and that their caregivers wished to adopt them. The report considered the beneficial-relationship exception and concluded that it did not apply.

Finally, the department completed and submitted to the court an assessment of the maternal grandmother's request for placement of the children. The assessment concluded, based on its consideration of the section 361.3 factors, that the grandmother would not be a suitable placement for the children.

In December 2024 and January 2025, the court held a contested hearing on mother's request to change the order terminating reunification services, the department's request for an order terminating mother's parental rights and selection of a plan of adoption for the minors, and grandmother's request for consideration as relative placement for the children under an alternative permanent plan. After hearing testimony by grandmother, mother, and the social worker, the court issued its order.

Addressing mother's section 388 petition first, the court found that mother had not met her burden of showing new evidence or a change of circumstance since the June 2024 order was entered that would justify her proposed change. The court found that mother "presented little or no evidence which would suggest that she has made any progress towards completing her case plan," including addressing her sobriety, substance abuse, and mental health issues. The court added that it was also making a finding that granting mother's petition was not in the best interests of the children.

The court also denied grandmother's placement request, finding that the children were in a sound placement with their caregivers and that grandmother was not a suitable placement for the children.

Finally, the court found by clear and convincing evidence that it was likely the children would be adopted and that termination of parental rights was in the children's best interests. The court found that the beneficial parental and

8

sibling relationship exceptions did not apply.  Accordingly, the court terminated parental rights and ordered a plan of adoption for the children.

## DISCUSSION

### I.    Grandmother's Request for Placement

#### A.    Legal Background

Under section 309, subdivision (d), when a child is detained, "[i]f a relative . . . is available and requests emergency placement of the child . . ., the county welfare department shall initiate an assessment of the relative's . . . suitability for emergency placement . . . ."  Once the court takes jurisdiction over the child, if the child is removed from parental custody, the department must identify and locate the child's adult relatives and "provide to all adult relatives who are located, except when that relative's history of family or domestic violence makes notification inappropriate, within 30 days of removal of the child, written notification and shall also, whenever appropriate, provide oral notification" of, among other enumerated things, "[a]n explanation of the various options to participate in the care and placement of the child and support for the child's family."  (§ 309, subd. (e)(1)(B).)

Under section 361.3, subdivision (a), a relative who requests placement of the child shall be given "preferential consideration."  Preferential consideration "means that the relative seeking placement shall be the first placement to be considered and investigated."  (§ 361.3, subd. (c)(1).)  The department is required to assess those relatives seeking

9

placement according to the factors listed in section 361.3, subdivision (a) (1)–(8) (placement factors) and must document those efforts in the social study prepared for the disposition hearing.  (§ 361.3, subd. (a)(8)(B).)  After the disposition hearing, "whenever a new placement of the child must be made, consideration for placement shall again be given as described in this section to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements."  (§ 361.3, subd. (d).)

In *In re Joseph T.* (2008) 163 Cal.App.4th 787, 795, the court rejected the argument that section 361.3, subdivision (d) limits application of the relative placement preference after disposition.  The court held that, "when a qualified relative comes forward after the initial placement and during the family reunification period and seeks placement of the child," the preference applies regardless of whether a new placement is required or is otherwise being considered by the dependency court.  (*In re Joseph T., at* p. 795.)

In *In re Isabella G.* (2016) 246 Cal.App.4th 708, 712, 723, (*Isabella G.*) the court held that if a relative makes a request for placement of a dependent child before the disposition hearing but the department does not timely complete a relative home assessment as required by law, the relative requesting placement is entitled to a hearing under section 361.3 without a showing that a change in placement is needed and even if reunification services have been terminated.

### B. Additional Factual Background

As detailed above, grandmother requested to be considered for placement for B.J. prior to the detention hearing and reiterated her request throughout the proceedings. Initially, the department indicated that the delay in consideration for placement was due to the condition and configuration of her home. In February 2024, after grandmother expressed frustration that, despite making the suggested modifications, no one had come out to assess her home, a social worker came and took pictures. The social worker told her, however, that the department "is not looking to moving the children into her home since it seems like the case is moving to [family maintenance]" and because the "children are stable in their placements[.]"

In September 2024, two years after the children were removed from their parents' custody, the department completed its assessment of grandmother's request. Based on the social worker's application of the statutory placement factors, the department recommended that the court find grandmother unsuitable for placement. The assessment explains that, while grandmother has addressed the issues in her physical home that the department previously identified, the department continued to have serious concerns about grandmother's ability to protect the children from harm.

The assessment states that when the children were living in grandmother's home with family maintenance services, grandmother failed to meet the children's needs and neglected their safety by failing to alert the department that mother was

11

continuing to experience domestic violence and abusing substances, and by allowing J.G. to leave with her father while he was under the influence of substances, which ultimately led to the police incident that resulted in the children's removal. The assessment states further that grandmother has not demonstrated "good moral character" as evidenced by her disrespectful and volatile behavior towards the current foster family and her failure to protect the children as noted above. In addition, the assessment expresses concern about grandmother's continued inability to "accurately assess when [mother] is a safety concern to [the children], leaving them in a vulnerable situation," as demonstrated by her report to the social worker in September 2024 that despite strong indications to the contrary, mother was "doing very well lately, ha[d] done everything the Department ha[d] asked of her, and [was] not abusing substances." The social worker reported that, while grandmother "has some insight into her daughter's past substance abuse," she cannot "clearly articulate the indicators of when her daughter has relapsed or is in active substance abuse" and that grandmother "believes her daughter is sober, whereas the Department has serious concerns regarding [mother's] sobriety." The assessment also explains that grandmother was participating in unsupervised visitation when the older brother visited with his siblings but that the visits were reduced and were required to be supervised after the children began exhibiting signs of anxiety and aggression after the visits. According to the assessment, the children's therapist opined that

it would "likely be detrimental to their mental health and safety if they were to live with [grandmother] due to the extreme behaviors following visits." Finally, the assessment indicates that B.J. has indicated a preference to remain in his current placement.

At the section 366.26 hearing, after admitting the assessment into evidence and taking testimony from grandmother, the court denied her request for placement. The court explained, "With regard to maternal Grandmother's request for placement, this Court is entirely unconvinced that it would be in the children's best interest to be uprooted and placed with their maternal Grandmother. First and foremost, they are in a sound placement with their current caregivers and this Court is not about to upend that arrangement. But even if they were not in such a healthy environment, the evidence would not support placement with maternal Grandmother. The record is replete with evidence that maternal Grandmother's relationship with her daughter is wildly unhealthy. The Court found evidence showing that when the children were briefly placed in maternal Grandmother's care, she essentially lived in fear of Mother and what would happen to her and the children. She was so afraid, she neglected to advise the Department of her belief that Mother and her boyfriend were using drugs until well after the children had been detained. [¶] Additionally, Mother herself has repeatedly and often cited her mother's care of her as the reason for her own troubles. She blames her mother and has described her many times as emotionally abusive. This is a theme

13

espoused by Mother and Grandmother, i.e., that their relationship has been fraught with emotional abuse. The risk of exposing the children to this otherwise fractious and troubled mother-daughter relationship is far too high to warrant any consideration of maternal Grandmother as a potential placement, particularly in light of the healthy situation the children are now in."

## C.    Analysis

Mother contends that the department failed to comply with the requirements of section 309 at the time of the children's detention and to afford maternal grandmother preferential placement consideration as required by section 361.3. She argues further that the department's eventual assessment of placement with grandmother was not "complete" and that the belated evaluation, conducted on the "eve of the section 366.26 hearing," did not give grandmother a " 'fair chance' and opportunity for placement or preferential consideration."

### 1.    Forfeiture

The department contends that mother forfeited her arguments by failing to raise placement at any time before the section 366.26 hearing. We agree, in limited part, that mother forfeited her claims regarding the department's failure to comply with section 309 at the time of the children's detention. (*In re A.K.* (2017) 12 Cal.App.5th 492, 500−501.) If mother believed the social worker had not complied with statutory requirements in pursuing the grandmother as a relative placement at the time of the disposition, she should have raised the issue in the trial court

14

or on appeal at that time.  Mother has not, however, forfeited her challenge to the court's denial of grandmother's request for preferential placement under section 361.3 at the section 366.26 hearing.

## 2. Standing

The department argues that mother lacks standing to challenge the denial of grandmother's request for placement because her reunification services had been terminated and she has not demonstrated how the court's decision not to place the children with grandmother advances her argument against terminating parental rights.

On appeal, a parent is precluded from raising issues that do not affect his or her rights.  (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1034–1035 (*Cesar V.*).)  Generally, "[o]nce a parent's reunification services have been terminated, the parent has no standing to appeal relative placement preference issues." (*In re Jayden M.* (2014) 228 Cal.App.4th 1452, 1460; *Cesar V.,* at pp. 1034–1035.)  In *In re K.C.* (2011) 52 Cal.4th 231, 238, the court recognized, however, that "[a] parent's appeal from a judgment terminating parental rights [can] confer[] standing to appeal an order concerning the dependent child's placement . . . if the placement order's reversal advances the parent's argument against terminating parental rights."  In other words, parents have standing if the "possibility exist[s] that reversing [the placement decision] might lead the juvenile court not to terminate parental rights."  (*Id.* at p. 237.)  On appeal, "[w]e liberally construe the issue of standing and resolve doubts in

15

favor of the right to appeal." (*In re H.G.* (2006) 146 Cal.App.4th 1, 9.)

Here, mother argued against the termination of her parental rights in the juvenile court on the grounds that (1) the court should grant her section 388 petition and return the children to her with family maintenance services; (2) the parental and sibling relationship exceptions precluded termination of her parental rights; and (3) guardianship with grandmother was a more appropriate alternative plan to adoption. Mother argues that she has standing to appeal the placement decision because it had the potential to alter the court's determination of the child's best interests in connection with the arguments she asserted at the hearing and thus, might have led the juvenile court to not terminate her parental rights.

Given how intertwined the placement decision was with the court's ruling on mother's section 388 petition and the termination of parental rights, we cannot conclude on the record before us that mother lacks standing to challenge the placement decision. It is possible that, had the children's placement been changed, the court's analysis at the termination hearing might have been altered. (See *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054 [resolving doubts in favor of mother's right to appeal where alternative permanency plan to adoption was unlikely but nonetheless remained a statutory option for the juvenile court]; *In re H.G.*, *supra*, 146 Cal.App.4th at p. 10 [parents had standing to appeal where the placement decision had "the potential to alter the court's determination of the child's

16

best interests and the appropriate permanency plan for that child, and thus may affect a parent's interest in his or her legal status with respect to the child"].)  For this reason, this case is distinguishable from *In re K.C.*, *supra*, 52 Cal.4th at page 238, in which the father did not make any argument in opposition to the termination of his parental rights at the section 366.26 hearing.

### 3.     The Section 316.3 Assessment

There is no real dispute that the grandmother timely requested placement of the children and the department failed to complete the assessment as required by law.  But we reject mother's argument that this "violation of a 'mandatory' duty" requires reversal of the order terminating parental rights.  In *Isabella G., supra*, 246 Cal.App.4th 708, 712, the court held that when placement is timely requested but the assessment is improperly delayed, the court must hold a hearing and evaluate the placement request under section 361.3.  That is precisely what the court did here.  The department conducted an assessment in September 2024, and the court considered the request at a hearing consistent with the requirements set out in *Isabella G.*  Accordingly, we review the court's rejection of the grandmother's placement request for an abuse of discretion. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067–1068, superseded by statute on another ground as stated in *Cesar V., supra,* 91 Cal.App.4th at p. 1032.)

Contrary to mother's argument, the department's assessment was sufficiently complete.  Mother's suggestion that the assessment merely expressed "concern that grandmother may

not have done what could have been done to protect the children from mother or father when the children were living with her [but] . . . did not assess the remainder of section 361.3 factors" is not supported by the record. The assessment separately considered each of the factors before concluding that placement with grandmother would not be in the children's best interests. It is therefore distinguishable from *In re H.G.*, *supra*, 146 Cal.App.4th at page 15, cited by mother, in which the department's assessment considered only two of the section 361.3 factors.

Mother asserts further that the assessment "appears to be a post-hoc" justification for denying placement and that the department "obviously" did not believe its concerns were serious or it would not have placed the older sibling with grandmother. The assessment acknowledged, however, that the older sibling was placed with grandmother, but explained that his needs presented vastly different responsibilities and safety concerns. The older sibling was old enough to care for his own basic needs and could seek out help if needed, whereas the younger siblings could not. The department indicated that grandmother's inability to assess safety or protect the children made her unsafe to care for the young, vulnerable children.

Contrary to mother's argument, the department's concern that grandmother may not have been able to recognize when mother was using drugs is not "mere speculation." Nor is the department's concern that grandmother would not protect the children speculative. The assessment sets forth the factual basis

18

for its opinion:  grandmother's conduct prior to the removal of the children and her statements at an interview conducted in September 2024.  In addition to noting that grandmother "could not clearly articulate the indicators of when her daughter has relapsed," the assessment notes that, during the September 2024 interview, grandmother "was unable to appropriately answer the majority of questions that were asked of her.  When asked about discipline and parenting experience, [she] provided stories to the interviewers that were loosely related to the questions.  She stated that it was difficult for her to come up with answers when she does not know what the future holds or exactly what the situation will be like in the future.  This lack of ability to formulate safety plans has the department concerned that [grandmother] would be unable to provide effective care and control of the children."

Mother also asserts that the department's determination that grandmother had not demonstrated "good moral character" was based on conduct which lacked "depravity, substance abuse, or the like" and thus, was not demonstrative of moral character. Neither party cites authority defining good moral character for purposes of child custody.  For our purposes, however, it is the facts set forth in the assessment that are important, not the department's determination as to whether they reflect poor moral character.  The facts are that grandmother had a history of disrespectful and volatile behavior towards the foster parents and failed to report safety concerns to the department.

19

Finally, mother argues that the department and the court "did not give [grandmother] a 'fair chance' and opportunity for placement or preferential consideration" and improperly relied on "the bonds forged with the foster family during the time when the Department was not exercising any diligence in the assessment of the grandmother for placement." In *Isabella G., supra*, 246 Cal.App.4th at page 723, the court emphasized that a relative requesting placement need not show that "the *change of placement* was in the child's best interest," but that the court must decide whether "*placement* with a relative is in the child's best interest." Even assuming that the court improperly concluded that uprooting the children would not be in their best interests, the court also expressly concluded that "even if they were not in such a healthy environment, the evidence would not support placement with maternal Grandmother."

Mother's reliance on *In re R.T.* (2015) 232 Cal.App.4th 1284 is similarly misplaced. In that case, the court reversed an order terminating parental rights where the record established that the social services agency disregarded the statutory mandate that preference in the placement of a child removed from the custody of his parents be given to qualified family relatives and the trial court erred in failing to apply the statutory preference for relative placement. (*In re R.T., supra*, 232 Cal.App.4th at p. 1308.) There, the relative had requested placement almost immediately upon the child's detention and, while the assessment was commenced, it was not completed before parental rights were terminated more than two years later. (*Id.* at pp. 1297, 1299.)

20

The court remanded with instructions that the social services agency "submit new reports and recommendations which update the relevant facts and apply the correct standards" and the court review the agency's decisions and act upon its recommendations pursuant to appropriate standards. (*Id.* at p. 1308.) Critically, the court advised, "We recognize that what is in the child's best interests at this point, almost two and one-half years after his birth, may well differ from what would have been his best interests when he was still an infant. The passage of time may have strengthened R.T.'s bonds with his caretakers and other circumstances may have developed that bear on an evaluation of his best interest. Meaningful redress for past mistakes may not be possible, but we cannot unwind the clock. The interests of stability and continuity may or may not prevail over familial bonds. This difficult question must be decided in the first instance by the juvenile court under the governing legal standards, which must be applied to the circumstances as they exist at the time of the hearing on remand." (*Ibid.*)

Here, unlike in *In re R.T.,* the department completed the assessment, albeit belatedly, and the court considered grandmother's request under the proper standard. We cannot know what might have happened had the children been placed with grandmother at the time of the disposition and had she been afforded appropriate support and services, but it does not appear that the court abused its discretion in rejecting placement with grandmother when the matter was ultimately decided.

## II.    Mother's Petition for Modification

21

Under section 388, a party may petition the court to change, modify, or set aside a previous court order.  The petitioning party has the burden to show, by a preponderance of the evidence, that there is a change of circumstances or new evidence, and that the proposed modification is in the child's best interests.  (§ 388; *In re N.F.* (2021) 68 Cal.App.5th 112, 120.)

When, as here, a section 388 petition is filed after reunification services have been terminated, the juvenile court's overriding concern is the child's best interest.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)  A section 388 petition at this time "provides a means for the court to address a legitimate change of circumstances while protecting the child's need for prompt resolution of his custody status." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309; *In re Malick T.* (2022) 73 Cal.App.5th 1109, 1123 ["The parent's interests in the care, custody and companionship of the child are no longer paramount; and the focus shifts to the needs of the child for permanency and stability"].)  At this stage, there is a rebuttable presumption that continued foster care is in the best interests of the child.  (*In re Marilyn H.*, at p. 310.)  The best interests standard, however, requires more than "a simplistic comparison between the natural parent's and the caretakers' households." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530.)  In determining whether a section 388 petitioner has made the requisite showing, the juvenile court may consider the entire factual and procedural history of the case, including factors such as the seriousness of the reason leading to the child's removal, the reason the problem

22

was not resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner. (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 616; *In re Kimberly F.,* at p. 532 [factors to consider in determining child's best interests include "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been"].)

We review the denial of a section 388 petition for an abuse of discretion. (*In re N.F., supra,* 68 Cal.App.5th at p. 120.) A juvenile court " 'abuses its discretion when it applies the wrong legal standard or its factual findings are not supported by substantial evidence.' " (*In re R.F.* (2023) 94 Cal.App.5th 718, 728.)

Mother contends the court applied an incorrect legal standard to the determination of her petition. She argues that the trial court improperly required her to prove that she had resolved the issues that gave rise to jurisdiction and is currently "free of her dependency on drugs." We find no error.

In making its ruling, the court recited in considerable detail the issues that led to the dependency proceedings, the services provided by the department to address those issues, and mother's minimal participation in those services. The court "carefully considered mother's testimony denying her current

23

use and dependency on illegal substances" and found it to be "wholly unbelievable." The court added that "even if it is true that she is presently clean and sober, Mother's testimony is scant in the face of clear and convincing evidence that she spent almost the life of these cases mired in delusion about whether she had a drug problem, denying what she now admits was her use of methamphetamine, projecting her delusion onto others, abusing social workers and accusing them of only being out to steal her children, berating Department staff for pressuring her to comply with her case plan, and spinning her wheels when it came to visitation which was frequently marred by inappropriate behaviors on her part calculated to disrupt the children's sense of well-being." In sum, the court found that there was "no basis on which it can conclude that by a preponderance of evidence Mother has made progress in completing her case plan and is free of her dependency upon drugs. She may or may not be currently sober or abstaining from use of drugs, but that is not the same thing as being sufficiently clean and sober so as to warrant returning the children to her care. That would require that she actually had engaged in her case plan when she had the chance and demonstrated to the Court, and her service providers, that she has put her troubled past behind her. Mother is required to show that she has resolved the issues which gave rise to the Court's jurisdiction, and she very simply has failed to do that."

Initially, we reject mother's argument that her drug use was not a "problem" that led to the dependency proceeding.

While the initial petition was focused on mother's failure to protect the children from father's conduct, the subsequent petition and events established that mother's drug use was a serious concern as well and that mother repeatedly failed to acknowledge and address it. In denying mother's section 388 petition, the court remarked, "The Court has been reminded that the children were initially detained but not removed from Mother's care because she was involved in a violent relationship which posed a serious risk of harm to the children. They were left in Mother's care because she was believed to be attempting to extricate herself from her violent relationship with [father] and his drug abuse, and it appeared that with assistance and with him out of her life, she might be able to offer the children a safe and sober living environment. However, it became apparent early on that Mother herself was abusing substances, which she now describes as her trying quote-unquote to cope with her violent relationship with . . . father. She also testified that her use of methamphetamine after the children had been left in her care under the plan of family maintenance did not amount to, quote, 'Active use,' end quote, as that would, in her view, imply that she was using every day. [¶] According to her, she was only using methamphetamine about two times per month when the Department filed a supplemental petition." The trial court noted that despite being advised that she would need to submit to a substance use evaluation, participate in a drug treatment program, and submit to random drug tests, she had not, as of the

hearing, completed a substance abuse program and her compliance with testing had been problematic as well.

Mother's substance abuse issues permeated the dependency proceedings. Under these circumstances, requiring her to prove that she had addressed those issues and was currently free from drugs is not inconsistent with applicable legal standards. "In the context of a substance abuse problem that has repeatedly resisted treatment in the past, a showing of materially changed circumstances requires more than a relatively brief period of sobriety or participation in yet another program." (*In re N.F., supra,* 68 Cal.App.5th at p. 121, citing *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 ["parents' most recent efforts at sobriety 'were only three months old' and did not demonstrate changed circumstances"]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423, ["parent's seven months of sobriety since his last relapse were insufficient to show changed circumstances, given the parent's history"]; *In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 531, fn. 9, [" 'It is the nature of addiction that one must be "clean" for a much longer period than 120 days to show real reform' "].)

In any event, any possible error in the court's articulation of the standard is harmless in this case. Contrary to mother's assertion, there was no reasonable possibility that the court would have reached a different outcome had it merely required her to show a "legitimate change in circumstances." Here, while mother's evidence might support a finding that she had engaged in some services—established a safe home, started therapy, and

26

obtained a restraining order against J.G.'s father—the record does not establish a legitimate change in circumstances with regard to her drug use. Mother does not deny that she never engaged in drug treatment, and at the hearing she continued to insist that treatment was unnecessary. On appeal, she fails to acknowledge her burden of proof when she argues, "Although mother did not submit for drug testing after the termination of services in June of 2024, there was no evidence that mother continued to use drugs. During her visitation after June of 2024, there was no indication that she was under the influence or suspicion that she was under the influence in visitation. There was no report from the therapist, psychiatric nurse, or parenting class providers that mother was under the influence after June of 2024."

Finally, contrary to mother's assertion, the court did not improperly compare her to the foster parents in determining the best interest of the children. The court did not address the children's bonds with their foster parents at all in explaining its reasons for the denial of mother's section 388 petition. The court reasonably concluded that the return of the children to mother's care would not be in their interests given her failure to address the substance abuse issues as directed by her case plan.

Accordingly, we find no error in the denial of mother's section 388 petition.

III.  **Parental-Benefit Exception**

In *In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*), the Court explained, "[W]hen a court proceeds to select a permanent

placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute.  One of these is the parental-benefit exception."  The exception "requires a parent to establish, by a preponderance of the evidence, . . . that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*Ibid.* [citing § 366.26, subd. (c)(1)(B)(i)].)  "[T]he exception applies in situations . . . where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Id.* at pp. 629–630.)

"Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  The court must therefore determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*)  Overall, the court asks "whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.)

We review the first two *Caden C.* factors—whether the parent has visited the child regularly and whether the child would benefit from continuing the parent-child relationship—for

substantial evidence.  (*Caden C., supra*, 11 Cal.5th at pp. 639–640.)  We likewise review the factual determinations underlying the third factor for substantial evidence.  (*Id.* at p. 640.)  We review the court's ultimate decision as to the third factor—whether terminating the parent-child relationship would be detrimental to the child—for abuse of discretion.  (*Ibid*.)

Mother argues that the record supports application of the parental-benefit exception and that the court relied on impermissible factors in reaching its conclusion that the exception was not applicable.

Initially, we note that although the trial court confirmed that it had concluded that the exception was not applicable, it did not expressly conduct an analysis under *Caden C.* on the record. The court, however, was not required to do so, nor was it required to make any specific findings on the record.  (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.)  While "a statement by the trial court of its findings (or reasons) for its decision is helpful in conducting appellate review, it was not a legal requirement in this instance." (*Ibid*.)  Accordingly, we presume the court understood the applicable law and correctly applied it in the absence of evidence to the contrary.  (*People v. Tilley* (2023) 92 Cal.App.5th 772, 780 ["As a general rule ' "a trial court is presumed to have been aware of and followed the applicable law" ' "].)  Moreover, so long as this court concludes that the juvenile court did not abuse its discretion and/or that sufficient evidence supported the juvenile court's ultimate ruling, the court's reasons for its ruling are irrelevant.  (*Anderson v. Davidson* (2019) 32 Cal.App.5th 136, 144

[" ' "[W]e will affirm a judgment correct on any legal basis, even if that basis was not invoked by the trial court. [Citation.] There can be no prejudicial error from erroneous logic or reasoning if the decision itself is correct" ' "].) As discussed below, we find no error in the court's determination that the parental-benefit exception did not apply.

###### A. Regular Visitation

The department's report indicates that mother visited consistently with the children until visitation was suspended in September 2024. At the hearing, the department argued that, given the suspension of visitation, the first *Caden C.* factor had not been met. On appeal, the department reiterates its position that mother's failure to visit in the several months preceding the hearing precludes application of the exception. Mother insists that she visited consistently to the extent permitted by the court order. (See *Caden C., supra,* 11 Cal.5th at p. 632 ["[t]he question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders' "].)

Absent an express finding by the trial court, we must assume the court resolved this factor against mother and ask whether substantial evidence supports the court's implied finding. Here, the record is clear that fault for the lack of visitation rests squarely on mother's shoulders. At the hearing on the department's request to suspend visitation, the department argued, "Unfortunately, Mother has shown an inability or unwillingness to commit to following the guidelines for visitation. There has been a history of unsafe behavior during

30

visits and in front of the children. Many visitation monitors do not feel safe supervising visits with this Mom. [¶] There [have] been several incidents. One where she was holding onto [B.J.] and wouldn't let him go and return to the foster parents despite being requested to do so. There has been—Mom's been aggressive, raised both her hands in a gesture indicative she might hit the visit monitor. This was in the visitation area of the office. [¶] During the last visit, September 4th, Mother followed the visit monitor with the children in the car. Prior to that, she wouldn't release the door after helping the kids in the car, stating she wants the monitor to leave until she was able to call her attorney." The social worker testified that, after the September 4 incident, she drew up some guidelines and attempted to meet with mother, but mother was either incapable of understanding the reasons for the guidelines or refused to participate in the conversation. The social worker also testified that mother's aggressive behavior "creates a lot of conflict within particularly with [B.J.] I think what tends to happen is Mom is very emotional, and [B.J.] tends to co-regulate with her and become very emotional and upset and is very interesting to observe because at that exact moment, [J.G.] backs away generally and will stand with the visit supervisor and encourage [B.J.]. Come on, [B.J.], it's time to go, and it's very sad to watch that." Minor's counsel also agreed with the department's request.

Arguably, the failure to visit in the three months preceding the termination of parental rights precludes application of the

31

exception.  While we could resolve this issue on this ground, we briefly address mother's remaining arguments.

### B.     Substantial Positive Relationship/Detriment

The department's section 366.26 report indicated that, "[b]ased on the children's age and the fact that they have been in care for the past two years and [mother's] continued concerning behaviors during visits that result in additional conflict and stress for the children, the Department believes that continuing the mother/child relationship would not be beneficial as the relationship is not one of substantial, positive emotional attachment for either [child]."  The report added, "Given the fact that there does not appear to be substantial, positive emotional attachment, the instability the children experienced in [mother's] care due to domestic violence and substance abuse, and the continued unwillingness or inability of [mother] to properly assess the children's needs and conduct herself in a healthy manor [sic] during visitation, the need of the children for permanency far outweighs any harm of severing the parent/child relationship between the children and their mother."

At the hearing, the department argued that "[t]here's not a substantial positive relationship such that these children should not be adopted.  [¶]  They would indeed continue to thrive.  They don't ask for more visits with their mother.  They're not crying about it.  Their behaviors have gotten better and improved.  B.J. is doing better in school.  J.G. isn't exhibiting the same behavior she had before.  In fact, they've actually been doing much better since visits have stopped.  That alone indicates that the

32

relationship isn't so substantial and positive such that the . . . adoption shouldn't go forward." Minor's counsel agreed, noting, "We are in a rare circumstance where we don't typically get a practice run of what life would be like without visits with the parents. Here we've had that. Since September 4th, mom hasn't had visits. We've gotten to see from that sample size to see what life would be like for them and the evidence here shows that they are doing extraordinarily well. They continue to do better and they continue to thrive." With regard to the last two factors, the children's counsel argued, I "do not see a substantial positive bond. I do not see the positive. . . . Because of [mother's] behaviors, they're not positive for the children. In a sense they're being parentified because of what they've been subjected to. [¶] And I do believe it would be [] detrimental if they were taken from this home. They deserve stability. They deserve to be children. I implore Your Honor to please find and move forward with the Department's recommendation to terminate parental rights and order the permanent plan of adoption."

Substantial evidence supports the court's implicit finding that the children do not have a significant parental bond with mother and that termination of parental rights would not be detrimental to the children. We note that mother focuses solely on the strength of her relationship with B.J. and argues that if the court's order is reversed as to him, the order as to J.G. should be reversed as well. This is undoubtably because the evidence with respect to J.G. is clear. She was a year old when removed from her mother's care and has spent the majority of her life with

33

her foster parents.  B.J., however, having spent the first three years of his life with mother, undeniably has more of a relationship with mother.  As mother notes, the record contains statements from B.J.'s therapist and the social worker reflecting the existence of a parental bond with both his foster parents and mother.  The record also reflects, however, that B.J.'s relationship with his mother was not always healthy and that visits resulted in extreme anxiety and misbehavior.  As argued at the hearing, his anxiety and misbehavior improved considerably after visitation was suspended.  It is clear that termination of the relationship has not been detrimental to the children in the short term.

Contrary to mother's argument, there is no reason to believe that the termination of the relationship will be detrimental to the children in the long term.  Even assuming, however, that mother and B.J. share some degree of a parental bond, the termination of which might result in some long term detriment, on the record before us, the court did not abuse its discretion in concluding that the stability offered by adoption greatly outweighed the preservation of that relationship.

Accordingly, we affirm the order terminating mother's parental rights.

## DISPOSITION

The order terminating parental rights is affirmed.

GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
STREETER, J.

34